Filed 7/10/20

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RONALD TALLEY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF FRESNO, <br><br> Defendant and Respondent. | F078541 <br><br> (Super. Ct. No. 17CECG00212) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Georgeson and Belardinelli, and Richard A. Belardinelli for Plaintiff and Appellant.

Liebert Cassidy Whitmore, Jesse J. Maddox and Sue Cercone for Defendant and Respondent.

-ooOoo-

# INTRODUCTION

Plaintiff Ronald Talley pleaded nolo contendre to a criminal offense for which he was sentenced to 18 days in the Fresno County Jail. Rather than serving those days in county jail, plaintiff was deemed eligible to serve the sentence by participation in the Adult Offender Work Program (AOWP) administered by Fresno County's Probation Department. Plaintiff was injured while performing work in the AOWP, and he filed suit against Fresno County (county) for, among other things, its failure to accommodate his preexisting physical disability and failure to engage in the interactive process under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA).[1]

Plaintiff's claims rest on the theory AOWP participants are county employees for purposes of the FEHA. County filed a motion for summary judgment arguing that because there was no remuneration for the work he performed in the AOWP, plaintiff cannot be deemed an employee under the FEHA. County also argued plaintiff's negligence claim was precluded because his sole remedy was workers' compensation. The trial court agreed with county and granted its motion for summary judgment on all claims.

On appeal, plaintiff asserts the trial court erroneously interpreted the FEHA and applied an incorrect legal analysis to conclude, as a matter of law, he was not an employee of county. He also asserts the trial court made an improper evidentiary ruling and impermissibly weighed the credibility of evidence in reaching its decision. Plaintiff maintains that under the correctly applied legal analysis coupled with the proper assessment of the facts, he has either (1) definitively proven his AOWP participation rendered him a county employee or (2) offered sufficient evidence to create a disputed issue of fact as to his employment relationship with county.

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

For the reasons discussed below, we conclude the trial court's grant of summary judgment was correct, and we affirm the judgment in full.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Background

In October 2015, plaintiff pleaded guilty to driving without a license or insurance and was sentenced by the Fresno County Superior Court to 18 days of jail time, which was to be served in the AOWP, a work release program that allows eligible participants to serve their sentence by performing work assignments for participating community and governmental agencies and is coordinated through county's probation department.

Plaintiff is physically disabled due to congenital talipes equinovarus, commonly referred to as clubfoot, which requires him to wear a 10-pound foot brace to walk; the brace limits his mobility and restricts him from certain activity.

As part of entering the AOWP, plaintiff was required to complete a probation form, the AOWP interview face sheet, which contains a bold-faced and all-caps notice that states "IN ORDER TO PARTICIPATE IN THE WORK PROGRAM, YOU MUST BE ABLE TO PERFORM MANUAL LABOR.  DO YOU HAVE ANY PHYSICAL OR MENTAL PROBLEMS THAT WOULD PROHIBIT YOU FROM PARTICIPATING IN THE ADULT OFFENDER WORK PROGRAM?"

Plaintiff placed an "x" on the face sheet indicating he had no problems that would prohibit his participation in the AOWP.  Plaintiff paid the $180 administrative fee to participate in the program, the probation department accepted him, and it assigned him to perform manual labor for the parks and recreation division within county's public works and planning department.

On February 4, 2016, the 18th and final day of his participation in the AOWP, plaintiff was assigned to blow leaves, and he was provided a heavy, gas-driven leafblower.  While climbing a stairway, plaintiff caught his foot in the stairway, his foot brace became lodged in a step, and he fell backwards, causing injury.  Later, plaintiff's

3.

foot was amputated. County provides workers' compensation coverage to AOWP participants; plaintiff applied for and received workers' compensation benefits, which included medical, temporary total disability and permanent partial disability due to the injuries he sustained on February 4, 2016.

## II. Procedural Background and Evidentiary Developments

### A. Plaintiff's Complaint and Allegations

Plaintiff filed suit against county in January 2017, but the complaint was not served. A first amended complaint was filed and served and then replaced by a second amended complaint (SAC) after county's demurrer was sustained. The SAC alleges plaintiff became employed by county in December 2015 by virtue of his participation in the AOWP, and he performed general maintenance on county property, including trash removal and city beautification under the direction of Fresno County Parks Services Supervisor Manuel Diaz and two other county workers.

The SAC alleges plaintiff has a clubfoot disability for which he wears a large 10-pound brace that enables him to walk properly; however, the disability reduced plaintiff's mobility and capacity to work while standing up, particularly over long periods.

The SAC avers county was aware of or should have been aware of plaintiff's foot disability due to the visibility and obvious nature of the boot-brace he wears to walk. Plaintiff also had discussed his disabled foot with supervisors at the parks department; he explained he had limited physical mobility and capacity due to the pain of walking on his disabled foot over extended periods, and explained to his supervisor that his work duties would have to be reasonably accommodated and adjusted due to this disability.

Despite knowing plaintiff had limited capacity to perform certain physical tasks, county failed to engage in an interactive process about the need to reasonably accommodate his disability: county would regularly cause plaintiff to walk long courses to pick up trash or heavy cement bricks. Although plaintiff made every effort to comply with his assigned tasks until the pain in his foot precluded it, county declined and refused

4.

to place plaintiff on any light duty work assignments or in any other manner accommodate his foot disability.

Then, on February 4, 2016, plaintiff informed his supervisors he was physically incapable of operating the heavy leafblower designed to be worn on the operator's back or side. Despite plaintiff's request to use a rake instead of the leafblower, plaintiff's supervisor ordered him to use the leafblower anyway. Plaintiff was instructed to blow leaves on county's University Medical Center Campus, including the second floor stairs and landings of the buildings. While performing these tasks, plaintiff's braced foot slipped on the surface of county's damp metal stairs, causing his foot to slide through the stairs a few steps from the ground. The boot brace became lodged under a step as he fell backward, and he landed on his back with his handicapped foot lodged into the stair above him. The impact and angle of the fall caused the bones in plaintiff's handicapped foot to fracture, and plaintiff also sustained injuries to his neck and back.

The SAC further alleges that plaintiff had been informed his disabled foot required amputation, and plaintiff became unable to work due to the pain and disfunction of his injured foot. County accepted a workers' compensation claim for the fracturing of plaintiff's disabled foot. Plaintiff alleged he filed a tort claim with county on August 2, 2016, which was rejected on September 27, 2016; and plaintiff filed a discrimination claim with the Equal Employment Opportunity Commission and the Department of Fair Employment and Housing (DFEH) on August 31, 2016, and plaintiff received a right-to-sue notice on October 25, 2016.

As a result of county's actions, the SAC set out eight causes of action. The first two causes of action alleged disability discrimination claims under the FEHA; the third and fourth causes of action alleged disability discrimination claims under the Government Code; the fifth cause of action asserted a negligence claim; the sixth cause of action was for dangerous condition of public property; the seventh was for gross

negligence; and the eighth claim was for negligent hiring, supervision or retention of a supervisor/manager.

In ruling on county's demurrer to the SAC, the court concluded the third, fourth, seventh and eighth causes of action were not viable. However, the first two claims under the FEHA, the negligence claim, and the dangerous condition on public property claims were cognizable. County filed an answer to the complaint, and discovery proceeded on the four remaining claims.

## B. Motion for Summary Judgment

### 1. County's Argument and Evidence

In June 2018, county filed a motion for summary judgment, or, in the alternative, summary adjudication. As to plaintiff's claims, county argued plaintiff was not an employee and had no employment relationship with county necessary for any liability under the FEHA. County cited *Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625 (*Mendoza*) and *Estrada v. City of Los Angeles* (2013) 218 Cal.App.4th 143 (*Estrada*) for the proposition that, because plaintiff received no direct or indirect financial remuneration from county for the work he performed in the AOWP, he could not be considered an employee of county under the FEHA. Further, even if he were an employee for purposes of the FEHA, plaintiff admitted county accommodated his need for duties he could perform given his limitations.

County pointed to plaintiff's deposition testimony wherein he explained that when he had told his supervisor about his foot limitation, he was told to use the smaller leafblower rather than the gas-operated machine that put stress on his foot. In his pre-complaint inquiry sent to the DFEH, plaintiff stated that whenever his AOWP duties became too stressful, his supervisor instructed him to sit down. He stated "[t]hey would accommodate me because of my club foot. The supervisor would tell the foreman that I needed to sit down, as it was hard on my foot."

County argued plaintiff's fifth and sixth causes of action were barred under the exclusivity provision of the Workers' Compensation Act. (Lab. Code, §§ 3600–3602, 5300.) County also argued plaintiff had no evidence a county employee's negligence was the proximate cause of his injuries. As to the sixth cause of action, county argued the government claim plaintiff submitted to county on August 2, 2016, did not include allegations that the stairs upon which he was injured were a dangerous condition or that his injury was caused by a dangerous condition of public property. Thus, county argued, the claim was outside the scope of his government claim and the claim had therefore not been presented to the public entity before filing suit as required. Moreover, even if the claim were not barred, plaintiff had no evidence the stairs constituted a dangerous condition.

### 2. Plaintiff's Opposition[2]

In opposition to the motion for summary judgment, plaintiff argued there was undisputed evidence he was an employee of county within the meaning of the FEHA at the time of his injury. Plaintiff argued the facts county used to support its motion in this regard did not establish as a matter of law that plaintiff was not an employee under the FEHA, but the facts plaintiff offered to support his opposition proved the opposite: he was an employee of county under the FEHA at the time of his injury.

Plaintiff disputed he was sentenced to jail, arguing instead he was sentenced to the AOWP without an option. While he did not receive monetary pay for his work in the AOWP, he was compensated in the sense he was able to return to his residence every night rather than being confined continuously in jail; his sentence was served in a more secure, less dangerous setting and he avoided the criminal environment at the jail, as well as the fear, discomfort and concerns jail confinement presented.

---

**2**    Plaintiff requested dismissal of his sixth cause of action in conjunction with his opposition to the motion for summary judgment.

Plaintiff argued how his work was performed in the AOWP established he was a county "employee" or, at a minimum, created a material factual dispute whether he was an "employee" for purposes of the FEHA. Plaintiff pointed out his work activities were directed and supervised by the parks and recreation division staff, and the probation department laid down specific rules and procedures for program participants. In other words, plaintiff's work participation, including but not limited to the clothing he was required to wear, which location he was assigned, the equipment used to perform tasks, and the scheduled time and days of his shift, was highly regulated and precisely directed and overseen by county. He also maintained county benefited from his AOWP work.

Plaintiff argued the *Mendoza* and *Estrada* decisions are distinguishable because each involved a volunteer, which plaintiff maintained he was not—he was ordered by the court to participate in the AOWP. Plaintiff also argued the remuneration test applied in *Mendoza* and *Estrada* is inapplicable and in conflict with other California case authority, which indicates remuneration is *not* a dispositive factor in determining whether an employment relationship exists for purposes of the FEHA. As to accommodating his limitations, plaintiff presented evidence to establish county admitted it did not engage in the interactive process under the FEHA, nor did it accommodate his limitations.

As to the fifth cause of action, plaintiff argued the negligence claim is based on an alternative theory of recovery, should it be determined plaintiff is not an employee of county. According to plaintiff, if he is not an employee under the FEHA, then workers' compensation is not his sole remedy.

### 3. County's Arguments in Reply

County reiterated it is undisputed plaintiff received no financial remuneration of any kind for his participation in the AOWP. In fact, he paid county to participate in the program rather than go to jail. Even to the extent plaintiff received an intangible benefit from avoiding jail time, that benefit came from the sentencing court not county. County also noted any benefit county received from plaintiff's participation in the AOWP is

irrelevant to determining whether plaintiff was an employee under the FEHA. Moreover, plaintiff's participation in the AOWP is analogous to the unpaid volunteer work in *Mendoza* and *Estrada*, which was subject to the remuneration test to determine employee status under the FEHA.

In his deposition testimony, county notes plaintiff testified that he could have served his sentence in jail rather than performing the manual labor in the AOWP, and his declaration in support of his opposition did not credibly controvert the fact he had an option to serve his time in confinement rather than through the AOWP. County also argued the other California case law that plaintiff cited does not apply to volunteer situations involving a complete lack of financial remuneration.

As to the facts plaintiff claims create disputed issues of fact as to whether his disability was accommodated by county, these relate to background information or relate to county's policies with respect to procedure or whether county felt it had a need to accommodate plaintiff; county argued none of these facts are relevant or material.

Finally, county asserted that, whatever plaintiff's employee status within the meaning of the FEHA, it is not determinative of his employee status under the Workers' Compensation Act. Plaintiff's opposition, according to county, also failed to rebut the application of the exclusive remedy doctrine of workers' compensation.

### 4. The Court's Ruling on the Motion

On August 18, 2018, the trial court issued a tentative ruling granting the motion in its entirety. The trial court applied the remuneration test utilized in *Mendoza* and *Estrada*, finding it undisputed that plaintiff had received no direct or indirect financial remuneration for his participation in the AOWP. The court also found it undisputed that plaintiff's participation in the AOWP was voluntary in the sense he could have quit at any time and served his sentence in jail rather than on work release. In making that determination, the trial court noted plaintiff's declaration was evasive about whether his participation in the AOWP was voluntary, but, in any event, he admitted in deposition

9.

that he had a choice of either going to jail or working in the AOWP. The court concluded as a matter of law that plaintiff was not an employee of county for purposes of the FEHA, and the court granted summary judgment as to the FEHA claims.

As to plaintiff's fifth cause of action for negligence, the trial court concluded it was barred because workers' compensation had been paid and, as a matter of law, it was plaintiff's exclusive remedy. The motion for summary judgment as to the sixth cause of action was denied as moot since plaintiff had dismissed the claim.

A hearing on the motion was held on September 12, 2018, and the court subsequently adopted its tentative ruling in full as its final decision on county's motion. Plaintiff timely appealed.

## DISCUSSION

### I. Plaintiff's FEHA Claims and Contention of Error

Plaintiff claims county failed to make reasonable accommodation for his disability and failed to engage with plaintiff in the interactive process. Under the FEHA, it is an unlawful employment practice for an employer or covered entity to fail to make a reasonable accommodation for the known physical or mental disability or medical condition of an applicant or an employee. (§ 12940, subd. (m)(1).) It is also an unlawful employment practice under the FEHA for an employer or other covered entity to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition. (§ 12940, subd. (n).)[3]

---

[3] The interactive process required under the FEHA "is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively." (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1195.)

10.

FEHA claims alleging failure to make reasonable accommodation or failure to engage in the interactive process require a plaintiff to establish, among other elements, that (1) the defendant was an employer or other covered entity as defined by the statute and (2) the plaintiff was an "employee" of the defendant or applied to the defendant for a job. (CACI Nos. 2541, 2546.)

Here, there is no dispute that county is an employer within the meaning of the FEHA. The central issue is whether plaintiff is an "employee" of county within the meaning of the FEHA. The trial court determined that because plaintiff earned no direct or indirect financial remuneration from county for his participation in the AOWP, plaintiff cannot be, as a matter of law, deemed an employee for the purposes of the FEHA.

Plaintiff argues the trial court's determination was an erroneous interpretation of the FEHA. He asserts financial remuneration is not the dispositive factor in determining whether someone may be deemed an "employee" within the meaning of the FEHA and, even if it were, plaintiff contends he obtained remuneration from county for his AOWP work, even if not financial. Moreover, to the extent other California Courts of Appeal have determined uncompensated workers cannot be employees within the meaning of the FEHA, those cases involved volunteers. Plaintiff maintains he was not a volunteer, he was forced into the AOWP without any options or choice, thus those appellate cases relied on by county and the trial court are inapposite.

## II.   Standard of Review

Summary judgment is properly granted when all the papers submitted show no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) A defendant moving for summary judgment meets this burden by showing that one or more essential elements of plaintiff's cause of action cannot be established, or that there is a complete defense. (Code Civ. Proc., § 437c,

11.

subd. (*o*); *Aguilar*, *supra*, at p. 849.)  If the defendant makes this showing, the burden shifts to the plaintiff to demonstrate a triable issue of fact exists.  (Code Civ. Proc., § 437c, subd. (p)(1); *Aguilar*, *supra*, at p. 849.)

A trial court's ruling granting summary judgment is reviewed de novo, and the nonmoving party's evidence is liberally construed while the moving party's evidence is strictly scrutinized.  (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*).)  "A court ruling on a summary judgment motion 'shall consider all of the evidence set forth in the papers, *except the evidence to which objections have been made and sustained*.'  ([Code Civ. Proc.,] § 437c, subd. (c), italics added.)"  (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.)

In reviewing a trial court's interpretation of a statute, we apply a de novo, or independent, standard of review.  (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)  While deferential consideration to the trial court's interpretation of the statute may be afforded, a reviewing court is not bound by that interpretation.  (*Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 681.)

The trial court's evidentiary rulings are reviewed for an abuse of discretion.  (See *LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 485 ["The weight of authority in this state is that we apply an abuse of discretion standard when we review trial court evidentiary rulings."]; *O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184, 1198–1199 (*O'Neal*).)

## III.    Plaintiff is Not An Employee Within the Meaning of the FEHA

The question presented in this appeal is whether an individual sentenced to perform work activities in lieu of incarceration in the absence of any financial remuneration, is precluded, as a matter of law, from being an "employee" within the meaning of the FEHA.

Plaintiff's claims require him to prove he is an employee of county within the meaning of the FEHA. The statute does not define "employee" other than to denote who is *not* included within the term: an "'employee' does not include any individual employed by that person's parent, spouse, or child or any individual employed under a special license in a nonprofit sheltered workshop or rehabilitation facility." (§ 12926, subd. (c).)

As other courts have concluded, the FEHA's definition of "employee" provides little guidance to ascertain who qualifies as an "employee." (See, e.g., *Shephard v. Loyola Marymount Univ.* (2002) 102 Cal.App.4th 837, 842 (*Shephard*); *Vernon v. State of California* (2004) 116 Cal.App.4th 114, 123–124 (*Vernon*); *Bradley v. California Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1625 (*Bradley*).)

When the language of the statute does not answer the question before us, we look to a variety of extrinsic aids to ascertain legislative intent, such as the legislative history of the statute, contemporaneous constructions of the provision made by the Legislature or by administrative agencies, or the impact of an interpretation on public policy. (See *People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) Courts also consider the ostensible objects to be achieved and the "'evils to be remedied'" by the statute. (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744.)

Interpreting the existence and scope of an employment relationship (e.g., who may be an "employee") pursuant to the FEHA is not a new question, nor is this the first time a court has considered whether an uncompensated worker may be deemed an employee within the meaning of the FEHA. California courts have adopted and engaged a set of interpretive tools in ascertaining the intent of the Legislature to answer questions the FEHA itself does not expressly address. Because the parties dispute how these interpretive tools have been engaged by various courts, and because it guides our consideration of the statute, we turn first to the legal framework developed by this and

13.

other courts to assess whether an individual is an "employee" within the meaning of the FEHA.

## A. Legal Framework

One of the primary methodological tools for interpreting the FEHA derives from federal court interpretation of similar terms within federal antidiscrimination statutes. This is predicated on the fact that "[i]n general, '[t]he language, purpose and intent of California and federal antidiscrimination acts are virtually identical. Thus, in interpreting the FEHA, California courts have adopted the methods and principles developed by federal courts in employment discrimination claims arising under' the federal acts." (*Reno v. Baird* (1998) 18 Cal.4th 640, 659; see *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 812.)

### 1. Employment Relationship in Compensated Work Context

In the context of paid work activities, *Bradley* and *Vernon* are two salient California cases considering the existence of an employment relationship, which is required for many claims under the FEHA. In *Vernon,* a city firefighter alleged he was an employee of the state for purposes of the FEHA, despite that there was no direct employment relationship between them. (*Vernon*, *supra*, 116 Cal.App.4th at p. 120.) The court noted the FEHA provided little guidance in determining whether there was an employment relationship between the two—i.e., whether Vernon could be an "employee" of the state, and the state his "employer." (*Id.* at pp. 123–124.) The court then turned to examine the tests designated by federal courts considering similar statutes and terms. (*Id.* at p. 124.) The court concluded the "common and prevailing principle espoused in all of the tests directs us to consider the 'totality of circumstances' that reflect upon the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties." (*Ibid.*)

The court then applied common law factors identified by the United States Supreme Court's decision in *Community for Creative Non-Violence v. Reid* (1989) 490

U.S 730, 751–752 (*Reid*) and other federal appellate courts to assess whether the relationship between Vernon and the state constituted an employment relationship under the FEHA.[4] (*Vernon, supra*, 116 Cal.App.4th at p. 125.) In considering these factors, the court concluded the state was not Vernon's employer within the meaning of the FEHA. (*Id.* at pp. 125–127, 131.)

In *Bradley*, a different panel of this court considered whether a temporary social worker, paid under a contract the California Department of Corrections and Rehabilitation (CDCR) had with the National Medical Registry, was an employee of the CDCR for purposes of the FEHA. (*Bradley, supra*, 158 Cal.App.4th at p. 1617.) Like *Vernon*, the court noted the lack of definitional guidance under the FEHA with respect to who could be considered an "employee" under the statute, and ultimately turned to the common law test utilized by federal courts in determining whether an employment relationship existed under similar statutes. (*Id.* at pp. 1623–1627.) *Bradley* noted California courts have looked to the federal courts' interpretive tools (specifically the common law test outlined in *Reid*) to determine whether an employment relationship exists. (*Id.* at p. 1626, citing *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 500–501 (*Metropolitan*).)[5] *Bradley* concluded that, while there is "no magic

---

[4]     *Reid* stated that, "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." (*Reid, supra*, 490 U.S.. at pp. 751–752.)

[5]     In *Metropolitan*, the California Supreme Court considered who came within the term "employee" under the Public Employees' Retirement Law (PERL), a term not defined by the statute. (*Metropolitan, supra*, 32 Cal.4th at p. 500.) Where statutes refer to "employees" without defining the term, *Metropolitan* observed that courts "have generally applied the common law test of employment." (*Ibid.*) *Metropolitan* cited the United States Supreme Court's

15.

formula" for determining whether the requisite employment relationship exists, "[t]he prevailing view is to consider the totality of the circumstances, reflecting upon the nature of the work relationship between the parties, and placing emphasis on the control exercised by the employer over the employees' performance of employment duties." (*Bradley*, *supra*, at p. 1626, citing *Vernon*, *supra*, 116 Cal.App.4th at pp. 124–125.)

Shared between *Vernon* and *Bradley* is their consideration of whether *compensated* workers had an employment relationship with their purported employers.

### 2. Employment Relationship in Unpaid Work/Association Context

#### a. Federal Courts

One year after the United States Supreme Court decided *Reid*, the Eighth Circuit Court of Appeals confronted the question whether an uncompensated membership in a nonprofit association created an employment relationship within the meaning of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.; Title VII). (*Graves v. Women's Professional Rodeo Ass'n, Inc.* (8th Cir. 1990) 907 F.2d 71 (*Graves*).) *Graves* involved a male who sought and was denied membership in the nonprofit Women's Professional Rodeo Association (WPRA). (*Id.* at pp. 71–72.) He brought suit against the WPRA under Title VII for denying him membership on the basis of his gender. (*Id.* at p. 71.)

To establish the requisite employment relationship under Title VII, Graves advanced an argument he was an employee based on application of the common law factors courts generally consider in determining the existence of an employment relationship. The court rejected this analysis, noting membership in the WPRA is not a

decision in *Reid*, which held that when Congress used the term "employee" without defining it, the United States Supreme Court has concluded that Congress "'intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'" (*Ibid.*, italics omitted.) The court noted California courts have applied this interpretive rule to various statutes dealing with public and private employment. (*Ibid.*) The *Metropolitan* court, guided by the United States Supreme Court's interpretive rule, adhered to the common law test to determine the meaning of the term "employee" within the PERL. (*Id.* at pp. 500–501.)

remunerative proposition and reasoning that while compensation alone does not prove the existence of an employment relationship, "it is an essential condition to the existence of an employer-employee relationship." (*Graves*, *supra*, 907 F.2d at p. 73.) In the absence of remuneration, the claim was denied "without probing the analyses used to deal with relationships that make it past this first cut." (*Id.* at p. 74.)

The Second Circuit adopted the *Graves* remuneration test in *O'Connor v. Davis* (2d Cir. 1997) 126 F.3d 112 (*O'Connor*), which involved an unpaid student internship. (*Id.* at pp. 113, 115–116.) O'Connor's college degree program required completion of field work, and she was placed by her school in an unpaid internship at a hospital. (*Id.* at p. 113.) During the internship, a hospital employee made comments and jokes to and about O'Connor of a sexual nature. (*Id.* at pp. 113–114.) O'Connor complained, left the hospital, and completed her internship at another facility. (*Id.* at p. 114.) She filed suit against the hospital, among other entities, for sexual harassment in violation of Title VII. (*Ibid.*) In seeking summary judgment, the hospital argued the Title VII claim had to be dismissed because O'Connor could not, as a matter of law, be an employee of the hospital within the meaning of Title VII, and the district court agreed. (*Ibid.*)

On appeal, the Second Circuit found the definition of "'employee'" under Title VII to be circular and unhelpful, and acknowledged the United States Supreme Court's statement in *Reid* that when Congress uses the term "'employee'" without defining it, courts should presume that Congress had in mind the conventional master-servant relationship as understood by the common law agency doctrine. (*O'Connor*, *supra*, 126 F.3d at p. 115.) The *O'Connor* court then observed that in most cases where an attempt has been made to discern the contours of the conventional master-servant relationship, it has been to distinguish between an employee and an independent contractor. (*Ibid.*) The court found this analysis flawed for application in the student intern context "because it ignores the antecedent question of whether O'Connor was hired by [the hospital] for any purpose. As the Supreme Court suggests, the common feature shared by both the

17.

employee and the independent contractor is that they are 'hired parties,' [citation], and thus, a prerequisite to considering whether an individual is one or the other under common-law agency principles is that the individual have been hired in the first instance. That is, only where a 'hire' has occurred should the common-law agency analysis be undertaken." (*Ibid*.)

Considering that O'Connor received from the hospital no direct or indirect financial renumeration or the promise thereof, the court concluded she could not be deemed an employee within the meaning of Title VII. (*O'Connor, supra,* 126 F.3d at p. 116.) The court reasoned that "[w]here no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist because although 'compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, … it is an essential condition to the existence of an employer-employee relationship.'" (*Id.* at pp. 115–116, quoting *Graves, supra,* 907 F.2d at p. 73.) In other words, while remuneration by itself does not *prove* one is an "employee," the lack of remuneration definitively precludes one from being an "employee."

The threshold-remuneration test has been adopted by the majority of United States Courts of Appeals, including the Second Circuit (*O'Connor*, *supra*, 126 F.3d at pp. 115–116); Fourth Circuit (*Haavistola v. Community Fire Co.* (4th Cir. 1993) 6 F.3d 211, 219–222 (*Haavistola*)); Fifth Circuit (*Juino v. Livingston Parish Fire Dist. No. 5* (5th Cir. 2013) 717 F.3d 431, 439 (*Juino*)); Eighth Circuit (*Graves*, *supra*, 907 F.2d at p. 73); 10th Circuit (see e.g., *McGuinness v. University of New Mexico* (10th Cir. 1998) 170 F.3d 974, 979 [medical student who received no remuneration did not establish an employment relationship for purposes of Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.; ADA)]); and 11th Circuit (*Llampallas v. Mini-Circuits, Lab, Inc.*

18.

(11th Cir. 1998) 163 F.3d 1236, 1243–1244 [officer-director who did not receive any compensation was not an "'employee'" within the meaning of Title VII]).[6]

Moreover, the Second Circuit and the Fourth Circuit have not precluded a showing of remuneration where significant *indirect* financial benefits have been received. (*Haavistola*, *supra*, 6 F.3d at pp. 219–222 [volunteer firefighter not paid a wage or salary, but still obtained substantial indirect financial benefits was not necessarily precluded from establishing remuneration]; *Pietras v. Board of Fire Comrs of Farmingville* (2d Cir. 1999) 180 F.3d 468, 475 (*Pietras*) [affirming finding volunteer firefighter was an "employee" under Title VII where she received significant indirect benefits, including pension, life insurance, death benefits, disability insurance, and limited medical benefits].)

### b. California Courts of Appeal

In the context of the FEHA, two California Courts of Appeal confronted the question of whether an uncompensated worker was precluded from being an "employee." (*Mendoza, supra,* 128 Cal.App.4th 625; *Estrada, supra,* 218 Cal.App.4th 143.)

*Mendoza* involved a disabled man who volunteered with the town as a community service officer (CSO), where he was assigned to a school to assist with traffic duty, crime prevention and neighborhood crime watch programs. (*Mendoza*, *supra*, 128 Cal.App.4th at p. 629.) The volunteer position was unpaid, and no other financial remuneration such as health insurance, retirement, or other substantive benefits was alleged. (*Id.* at p. 637.) His position as a CSO was later terminated by the town, and he filed a lawsuit alleging various employment-related claims, including under the FEHA, for failing to

---

**6** The Sixth and the Ninth Circuits comprise the minority position, which does not view remuneration as a dispositive threshold factor in the overall employment relationship, assessing it as one factor in the putative employment relationship. (*Bryson v. Middlefield Volunteer Fire Department, Inc.* (6th Cir. 2011) 656 F.3d 348, 354 (*Bryson*); *Fichman v. Media Center* (9th Cir. 2008) 512 F.3d 1157, 1160 [whether directors and independent producers were "employees" under the ADA and the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.)].)

19.

accommodate his disability.  (*Id.* at p. 630.)  The FEHA claims were dismissed after demurrer, and Mendoza appealed, arguing he had sufficiently alleged an employment relationship with the town.  (*Ibid.*)

Finding that the FEHA's provision excluding certain categories of people from being considered an "'employee'" was "not particularly helpful in determining under what circumstances one may be considered an employee for purposes of the FEHA," *Mendoza* turned to the regulations promulgated by the Fair Employment and Housing Council (FEHC) to implement the FEHA, which define employee as "'[a]ny individual under the direction and control of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written.'" (*Mendoza*, *supra*, 128 Cal.App.4th. at p. 632, quoting Cal. Code Regs., tit. 2, § 11008, subd. (c).)[7]  Mendoza argued he was appointed to his volunteer position, and relied on his police identification card, indicating he was a "'duly *appointed* [CSO].'" (*Mendoza*, *supra*, at p. 633.)

The court observed that a local controlling ordinance vested the town council with the exclusive authority to make appointments to employment, and there were no allegations that Mendoza was appointed by the town council.  (*Mendoza*, *supra*, 128 Cal.App.4th at p. 633.)  Mendoza also argued he acquired employee status pursuant to an implied contract of employment or through estoppel.  (*Id.* at p. 634.)  Both of these arguments were rejected by the court on the ground that terms of public employment are generally governed by statute, not contract.  (*Ibid*.)

*Mendoza* then looked to federal law as instructive of what analytical approach should be applied.  (*Mendoza*, *supra*, 128 Cal.App.4th at pp. 635–637.)  Citing the threshold-remuneration test adopted by several federal appellate courts, the *Mendoza* court noted there was nothing in the FEHA or its legislative history that evinced "an

---

**7**    California Code of Regulations, title 2, former section 7286.5, which *Mendoza* quoted, was renumbered "without regulatory effect" to new section 11008 in 2013.  (Register 2013, No. 40 (Oct. 3, 2013); see Cal. Code Regs, tit. 1, § 100.)

intent to depart from the requirement that compensation of some sort is indispensable to the formation of an employment relationship." (*Id.* at p. 637.) Mendoza pointed out that the Legislature tacitly acknowledged remuneration was an integral part of the employment relationship when it enacted amendments to the FEHA extending its coverage to disabled employees. (*Ibid.*) Specifically, when the FEHA was amended to clarify the definitions of physical and mental disabilities, the Legislature noted the important public policy of providing reasonable accommodations for disabled employees, employers were helping to strengthen our economy by keeping people working who would otherwise require public assistance. (*Ibid.*) This history, the court reasoned, was consistent with application of the threshold-remuneration test. (See *ibid.*)

The court concluded that even if Mendoza could meet one of the definitional standards under the implementing regulation such as appointment or apprenticeship, the absence of remuneration nonetheless precluded Mendoza, as a matter of law, from meeting the definition of employee for purposes of the FEHA. (*Mendoza*, *supra*, 128 Cal.App.4th at p. 637.)

In 2013, in a similar factual situation, the Second District Court of Appeal considered whether a volunteer reserve police officer was an employee of the City of Los Angeles within the meaning of the FEHA. (*Estrada*, *supra*, 218 Cal.App.4th 143.) Adhering to the decision in *Mendoza*, the court concluded Estrada did not fit within the FEHA regulatory definition of "employee" because he had not been appointed to an employee position within the civil service rules of the appointing city. (*Id.* at pp. 152–154.) Moreover, simply because the city had chosen to include volunteer reserve officers within the definition of "employee" strictly for purposes of workers' compensation coverage, this coverage did not constitute remuneration. (*Id.* at pp. 154–155.) The court reasoned this policy decision did not convert these uncompensated volunteers into municipal employees for all purposes. (*Id.* at p. 155.) Moreover, coverage in the workers' compensation program did not alter the fact that these volunteers served without

21.

remuneration—this benefit simply served to make a volunteer whole in the event he or she were to sustain injury while performing the duties of the position. (*Ibid.*)

### B. Employee Status Under the FEHA Requires Remuneration

As we understand plaintiff's brief, he argues that to determine whether the Legislature intended to include him within the definition of "employee" for purposes of the FEHA, we must first consider the words of the statute in the context of their ordinary and common usage and then interpret the words expansively given the remedial nature of the FEHA. Plaintiff contends that because the FEHA defines "employee" by who is not included, the Legislature intended to include everyone within the definition of "employee" who was not expressly excluded, particularly in light of the broad, remedial purposes of the statute. (§ 12926, subd. (c).) Had the Legislature intended to exclude from this definition those who do not receive financial remuneration, it presumably would have done so. Plaintiff argues "employee" is further refined by considering the statute's definition of "employer" (§ 12926, subd. (d)), and the dictionary definition of the terms "employing" and "employ," which he asserts means to engage the services of, or to put to work. In combining these elements, plaintiff asserts the FEHA's definition of "employee" encompasses every "person" not excluded in section 12926, subdivision (c), who is performing services for an "employer" as defined in section 12926, subdivision (d), and establishes an "employment relationship."

Plaintiff's attempt to parse the language of the statute through various dictionary definitions in conjunction with the remedial purpose of the statute is not a compelling aid in determining whether the Legislature intended financial remuneration to be dispositive of who could qualify as an employee under the statute. (See generally *City of Palo Alto v. Public Employee Relations Bd.* (2016) 5 Cal.App.5th 1271, 1294 ["Canons of statutory construction … "'are 'merely aids to ascertaining probable legislative intent.' [Citation.] No single canon of statutory construction is an infallible guide to correct interpretation in all circumstances."'"].) We are not the first court to interpret the term employee within

the meaning of the FEHA, and we are guided by the various interpretive tools adopted by other California courts in addressing this question.

### 1. Regulatory Definition of Employee Under the FEHA

We turn first to the regulatory definition of "employee" promulgated by the FEHC, the body tasked with promulgating regulations under the FEHA. (See § 12935, subd. (a); see also *Bradley, supra,* 158 Cal.App.4th at p. 1625.) The applicable regulation defines employee as "[a]ny individual under the direction and control of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written." (Cal. Code Regs., tit. 2, § 11008, subd. (c).) We give great weight to an administrative agency's interpretation of its own regulations and statutes under which it operates. (*Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1029.)

The regulation, while providing additional guidance as to the definition of "employee," does not contemplate whether an individual under the direction and control of an employer under any type of appointment, contract of hire, or apprenticeship may be deemed an "employee" in the absence of remuneration. When a statute fails to define the term "employee," and the implementing regulation does not provide sufficient or compelling guidance, "courts routinely look at the common law definition [of 'employee'] for guidance …." (*Bradley*, *supra*, 158 Cal.App.4th at p. 1626, citing *Metropolitan*, *supra,* 32 Cal.4th at pp. 500–501; see *Mendoza*, *supra*, 128 Cal.App.4th at p. 637 [regardless whether regulatory definition is satisfied, absence of remuneration prevents individual from attaining employee status under the FEHA].)

### 2. Common Law Factors and Legislative History

Plaintiff argues that to the extent common law is referenced to determine the legislative intent with respect to an "employee" under the FEHA, it is the 13-factor common law test articulated in *Reid* and implemented by *Bradley, supra,* 158 Cal.App.4th at page 1626 and *Vernon*, *supra*, 116 Cal.App.4th at pages 124 to 125 that applies, not the remuneration test utilized in *Mendoza* and *Estrada*. According to

23.

plaintiff, applying remuneration as a dispositive, threshold factor "appears to be the minority opinion in both State and Federal Courts [and t]he federal cases relied upon by *Mendoza* and/or *Estrada* do not require <u>financial</u> remuneration as a separate dispositive issue, but merely one of the common law factors considered in determining the employment relationship."

Plaintiff's argument misapprehends the threshold-remuneration test. In cases where there is no dispute that work was performed for a wage or salary, the threshold-remuneration test is satisfied, and the question is whether that "hired" party is an employee as evaluated by the nonexhaustive factors identified by *Reid*. (*Reid*, *supra*, 490 U.S. at pp. 751–752.)[8] In cases where the association or work performed does not involve a salary or wage, the threshold-remuneration test is then expressly considered and applied. As discussed above, federal courts considering whether a paid worker is an employee under Title VII examine the common law factors articulated by the Supreme Court in *Reid*, *supra*, at pages 751–752 without dispositive, threshold consideration of the remuneration factor. California courts determining the existence of an employment relationship under the FEHA that involves paid workers have likewise embraced the *Reid* common law factor test without expressly first considering remuneration. (See, e.g., *Vernon*, *supra*, 116 Cal.App.4th at pp. 124–125 and *Bradley*, *supra*, 158 Cal.App.4th at p. 1626.)

---

[8] In *O'Connor*, the court reasoned, "[a]s the Supreme Court suggests [in *Reid*], the common feature shared by both the employee and the independent contractor is that they are 'hired parties,' [citation], and thus, a prerequisite to considering whether an individual is one or the other under common-law agency principles is that the individual have been hired in the first instance." (*O'Connor*, *supra*, 126 F.3d at p. 115.) The Sixth Circuit Court of Appeals, however, does not "believe that the term 'hired party' from [*Nationwide Mutual Insurance Co. v.*] *Darden* [(1992) 503 U.S. 318 (*Darden*)] and *Reid* supports an independent antecedent remuneration requirement"; *Darden* included the term "hired party" only as a direct quote from *Reid*; the *Reid* court's use of the term "'hired party'" was in the context of the federal Copyright Act of 1976 (17 U.S.C. § 101 et seq.) and referred to the party who claims ownership of the copyright by virtue of the work for hire doctrine. (*Bryson*, *supra*, 656 F.3d at p. 354.)

24.

In the context of *unpaid* work, however, the majority of federal courts of appeals have adopted the threshold-remuneration test, which applies *Reid*, but in a modified manner by first considering whether the putative employment relationship involves remuneration. If the threshold-remuneration test is satisfied, then all the *Reid* factors are considered to determine whether an employment relationship exists. *Mendoza* and *Estrada* have followed this federal majority analysis.

Plaintiff argues *Mendoza*'s analysis cites authority that does not support application of the threshold-remuneration test. Not so. *Mendoza* cited *U.S. v. City of New York* (2d Cir. 2004) 359 F.3d 83 at pages 91–92 (*City of New York*) for the proposition remuneration is the threshold factor to consider. In doing so, *Mendoza* quoted from *City of New York*, which included an embedded citation to *Eisenberg v. Advance Relocation and Storage, Inc.* (2d Cir. 2000) 237 F.3d 111, 113–114 (*Eisenberg*). (*Mendoza*, *supra*, 128 Cal.App.4th at pp. 635–636.) These two Second Circuit cases encapsulate the federal majority approach to determine whether an individual is an "employee" within the meaning of Title VII.

*Eisenberg* involved a paid worker who sued her putative employer under Title VII and the New York Human Rights Law (NYHRL). (*Eisenberg*, *supra*, 237 F.3d at p. 113.) At summary judgment, the district court determined the plaintiff was not an "'employee'" and could not therefore invoke the protections of Title VII or the NYHRL. (*Eisenberg*, *supra*, at p. 113.) On appeal, the Second Circuit examined the *Reid* factors, noting that none is dispositive, and determined that Eisenberg was an "'employee'" within the meaning of Title VII and the NYHRL. (*Eisenberg*, *supra*, at pp. 114, 117–119.) The threshold-remuneration test was implicitly satisfied because Eisenberg was undisputedly a paid worker.

In *City of New York*, the court considered whether the plaintiffs, who performed unpaid work for the city as a condition of receiving certain public assistance benefits, had sufficiently pleaded they were employees of the city under Title VII. (*City of New York*,

*supra*, 359 F.3d at p. 92.)  Under the threshold-remuneration test, which becomes pivotal in circumstances where workers do not earn a wage or salary, the court held the plaintiffs had satisfactorily pleaded remuneration for their work in the form of cash subsidies and food stamps, among other public assistance benefits.  (*Ibid.*)  The Title VII claims were deemed viable, and the case was remanded.  (*Id.* at pp. 92–97, 102.)  The court explained that *when the threshold-remuneration test is satisfied*, whether an employment relationship exists under Title VII is then determined upon an examination of all of the common law factors of agency set out by *Reid*.  (*Id.* at p. 92.)  ["Once plaintiff furnishes proof that her putative employer remunerated her for services she performed, we look to 'the thirteen factors articulated by the Supreme Court in [*Reid*, *supra*,] 490 U.S. [at pp. 751–752]' to determine whether an employment relationship exists.  [(*Eisenberg*], *supra*, 237 F.3d [at pp.] 113–114.)]"].)

*Mendoza* correctly stated the threshold remuneration test, and considered it consistent with the legislative history of the FEHA:

> "Importantly, there is nothing within the FEHA or its legislative history evincing an intent to depart from the requirement that compensation of some sort is indispensable to the formation of an employment relationship.  In fact, our Legislature tacitly acknowledged that remuneration remans an integral part of an employment relationship when it enacted amendments to the FEHA extending its coverage to disabled employees.  For example, when the FEHA was amended to clarify the definitions of physical and mental disabilities, the Legislature made note of the important public goal that, by providing reasonable accommodations for disabled employees, employers were helping to strengthen our economy by keeping people working who would otherwise require public assistance. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2222 (1999-2000 Reg. Sess.) Apr. 11, 2000, p. 4.)  This rationale clearly indicates that the Legislature assumed and intended that disabled persons need to be compensated 'employees' in order to benefit from the FEHA's expanded protection." (*Mendoza, supra*, 128 Cal.App.4th at p. 637.)

In 2014, amid concerns specific to unpaid student interns and other volunteer work situations, legislation was proposed in California to amend the FEHA to extend certain

protections under the statute to these nonemployee groups.  Noting that federal and state court decisions—including *Mendoza, Estrada,* and *O'Connor*, among others—had ruled that volunteers were not protected under the FEHA or Title VII because they were not "employees" under the common law definition of the term, the proposed legislation sought to extend the FEHA to protect interns and other volunteers from both harassment and other specified forms of discrimination.  (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 1443 (2013-2014 Reg. Sess.) Mar. 17, 2014, pp. 3–5.)  The proposed legislation was ultimately enacted into law and became effective January 1, 2015.  (Stats. 2014, ch. 302, § 1, pp. 1–6.)

Section 12940, subdivision (c) was amended to make it an unlawful employment practice "[f]or any person to discriminate against any person in the selection*, termination, training,* or *other terms or treatment* of that person in any apprenticeship training program, any other training program leading to employment*, an unpaid internship, or another limited duration program to provide unpaid work experience for that person* because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status of the person discriminated against."  (*Ibid.*, italics added to amended portions.)  Additionally, section 12940, subdivision (j) was amended to extend protection against harassment to unpaid interns or volunteers.

The applicable regulations were also amended, effective April 1, 2016, to reflect these statutory changes.  The regulations now define unpaid interns and volunteers as "[a]ny individual (often a student or trainee) who works without pay for an employer or other covered entity, in any unpaid internship or another limited duration program to provide unpaid work experience, or as a volunteer.  Unpaid interns and volunteers may or may not be employees."  (Cal. Code Regs., tit 2, § 11008, subd. (k).)

The regulations also make it unlawful for an employer to discriminate against unpaid interns in the selection, termination, training, or other terms or treatment of those individuals on any basis protected by the FEHA. (Cal. Code Regs., tit. 2, § 11009, subd. (e).) Further, the regulations specify it is unlawful for unpaid interns, volunteers, and persons providing services pursuant to a contract to be subjected to unlawful harassment in the workplace on any basis protected by the FEHA. (Cal. Code Regs., tit. 2, § 11019, subd. (b)(1).)

Significantly, the Legislature did not take up the question whether remuneration was required to establish employee status under the FEHA. In extending protections to nonemployee groups who were involved in programs providing training for employment or limited duration programs to provide unpaid work experience, the Legislature noted the FEHA already extended protections against harassment to another nonemployee category: "'a person providing services pursuant to a contract,'" such as an independent contractor. (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 1443 (2013-2014 Reg. Sess.) Mar. 17, 2014, p. 4) Although the legislative history denotes express consideration of *Mendoza* and *Estrada*, none of the 2015 amendments to the statute vitiated remuneration as a threshold factor to determine whether an individual is an employee under the statute.

The common law factor analysis utilized by federal and California courts alike, in the context of the FEHA and other similar antidiscrimination statutes, considers remuneration a dispositive threshold factor to determine whether an individual *may* qualify as an employee. Based on the legislative history that was highlighted by *Mendoza* as well as the 2015 amendments to the statute and the related legislative bill analysis considering the 2015 amendments, we agree with *Mendoza* that there "is nothing within the FEHA or its legislative history evincing an intent to depart from the requirement that compensation of some sort is indispensable to the formation of an employment relationship." (*Mendoza*, *supra*, 128 Cal.App.4th at p. 637.)

28.

We conclude an individual cannot be deemed an employee within the meaning of the FEHA absent the existence of remuneration. The existence of remuneration alone does not prove an individual is an employee under the statute, but the lack of remuneration precludes such a finding. We turn next to consider what form of remuneration is sufficient to satisfy the requirement.

### 3. Remuneration Must Constitute Substantial Financial Benefit

It is undisputed plaintiff did not receive any pay, health insurance, dental insurance, life insurance, or retirement benefits for participating in the AOWP. Plaintiff contends, however, the benefits he received from county by staying out of jail were sufficient remuneration to satisfy the test. While the benefits he received were not monetary, plaintiff argues remuneration need not be in monetary form. Plaintiff cites *Arriaga v. County of Alameda* (1995) 9 Cal.4th 1055, 1064–1065 (*Arriaga*), which held that nonmonetary forms of remuneration could be considered to determine whether a volunteer was excluded from the definition of "employee" under the Workers' Compensation Act (Lab. Code, § 3200 et seq.; WCA).

Whether or not the benefit obtained is monetary, to qualify as remuneration, federal courts have held the benefit must be of a quantifiable, financial nature that is significant and not merely incidental to the work activities performed. As explained in *O'Connor, supra,* 126 F.3d at pages 115–116, "[w]here no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist …." The Second Circuit has identified several factors as indicative of "'financial benefit,'" including salary or other wages; employee benefits, such as health insurance; sick pay; or the promise of any of the following. (*York v. Association of Bar of City of New York* (2d Cir. 2002) 286 F.3d 122, 126 (*York*).)

These financial benefits "must meet a minimum level of 'significance,' or substantiality, in order to find an employment relationship in the absence of more traditional compensation. [Citation.] In *Pietras*[, *supra*, 180 F.3d at page 473], [the

29.

court] found benefits sufficient to satisfy the 'remuneration test' in the form of '(1) a retirement pension, (2) life insurance, (3) death benefits, (4) disability insurance, and (5) some medical benefits.'" (*York, supra,* 286 F.3d at p. 126.)

*York* involved claims under Title VII, pursued by an attorney who created several programs for a bar association on an unpaid basis. (*York*, *supra*, 286 F.3d at pp. 123-124.) Pursuant to her activities with the association, the association provided York with workspace, clerical support, publicity, and reimbursement of out-of-pocket expenses. (*Id.* at p. 124.) York also took tax deductions for expenses that were not reimbursed, and she enjoyed networking opportunities. (*Ibid.*) York's Title VII claim was dismissed for failing to qualify as an employee under Title VII in the absence of remuneration. (*Id.* at p. 125.)

York appealed, arguing the benefits she received were sufficiently substantial to meet the remuneration test. (*York*, *supra*, 286 F.3d at p. 125.) The Second Circuit rejected this argument by reasoning the benefits York received were merely a necessary incident to the association staging programs for the benefit of the bar. (*Id.* at p. 126.) Moreover, even if not entirely incidental to her activities for the association, the benefits were not sufficiently substantial—clerical support, limited tax deductions, and "'networking opportunities'" were not substantial benefits like those in *Pietras*. (*Ibid.*, citing *Pietras, supra,* 180 F.3d at p. 473.)

*Arriaga*, even though not controlling for purposes of interpreting the FEHA, is not contrary. (*Arriaga*, *supra*, 9 Cal.4th at pp. 1064–1065.) *Arriaga* involved an individual allegedly injured by toxic fumes while performing work for the county sheriff's department as part of a sentence imposed "'to work off a four year old speeding ticket.'" (*Id.* at p. 1059.) She brought a negligence action against the county and the state that was dismissed on the ground she was injured during the course of employment within the meaning of the Labor Code, and that workers' compensation constituted her exclusive remedy. (*Id.* at p. 1060.)

The WCA specifically excludes from the definition of "employee" "[a] person performing voluntary service for a public agency or a private, nonprofit organization who does not receive remuneration for the services, other than meals, transportation, lodging, or reimbursement for incidental expenses." (Lab. Code, § 3352, subd. (a)(9).) *Arriaga* held that a person working to comply with a court order to either pay a fine or work is not "'performing voluntary service'" within the meaning of Labor Code section 3352, and that any remuneration received "need not be monetary in form." (*Arriaga*, *supra*, 9 Cal.4th. at p. 1064.)

In a footnote, the court emphasized that if Arriaga had received money with which to pay her fine, she unquestionably would have received sufficient remuneration. (*Arriaga*, *supra*, 9 Cal.4th at p. 1065, fn. 7.) The court concluded the same result must be reached where she simply received credit against the fine instead. (*Ibid.*) For the proposition that remuneration need not be monetary, the court also cited *Barragan v. Workers' Comp. Appeals Bd.* (1987) 195 Cal.App.3d 637, 650 (*Barragan*) with approval. *Barragan* held that when an unpaid worker receives instruction and training designed to provide the worker with a skill, that worker has received remuneration and is therefore not a volunteer under Labor Code section 3352. (*Barragan*, *supra*, at p. 650.)

The remuneration *Arriaga* found sufficient, as well as that deemed sufficient under *Barragan*, was distinctly and quantifiably financial in form. The plaintiff in *Arriaga* was deemed to have obtained remuneration because she exchanged her labor in return for a complete offset of a monetary fine. In *Barragan*, the remuneration considered sufficient was job and skill training, which was not merely an incidental benefit of the hospital externship at issue, but as a factual matter, it was the primary purpose of the hospital's externship program. It is at least possible to translate specific job training into quantifiable, financial terms.[9]

---

[9] Whether unpaid workers participating in externships or internships of any type obtain sufficient remuneration to meet the threshold-remuneration test is not the issue in this case, and

Here, none of the benefits plaintiff claims to have received are financially significant and quantifiable. That alone excludes them from qualifying as remuneration. (*O'Connor, supra*, 126 F.3d at pp 115–116; cf. *Pietras, supra,* 180 F.3d at p. 473 [issue of fact whether remuneration was sufficient where there were significant indirect benefits of financial character bestowed for work performed as probationary volunteer firefighter]; *York, supra,* 286 F.3d at p. 126.) Additionally, the benefits plaintiff received were incidental to participation in the AOWP. (*City of New York, supra,* 359 F.3d at p. 92 ["[R]emuneration need not be a salary, [citation], but must consist of 'substantial benefits not merely incidental to the activity performed, [citations].'"].) Plaintiff states he was compensated for his work by being able to return to his home each day instead of being confined at the jail for the entirety of his 18-day sentence, he was able to serve his sentence in a more secure, less dangerous setting than jail where plaintiff believes the danger of physical and emotional harm is much greater and real. He further indicated in his declaration that he was compensated by avoiding the "environment of jail where serious criminal offenders were incarcerated, and the fear, discomfort and concern that jail confinement presents [were] avoided[]"; and he received credit against his incarceration time.

---

our discussion of *Arriaga* is not meant to draw any legal conclusions about remuneration in those circumstances, especially since *Arriaga* did not involve the FEHA. The point of this discussion is to highlight the fact that the nonmonetary remuneration approved in *Arriaga* was quantifiable in financial terms. *Arriaga* did not extend nonmonetary remuneration to such things like emotional satisfaction obtained from an unpaid work activities, professional networking, resume-building benefits, or obtaining professional references. In general, those types of gains *may* result from an unpaid work experience, but they are not a guaranteed return; this renders them *incidental* to the experience rather than a certain remunerative product of it. Moreover, these items are exceedingly difficult to quantify, financially or otherwise, much more so than job or skill training for which educational institutions have set price tags. In other words, there is a market for job training from which a quantifiable, financial calculation of value can be ascertained. Whether and under what circumstances job training would be deemed sufficient remuneration to satisfy the threshold-remuneration test is not before us.

Like *York*, none of these benefits are financial or quantifiable in a financial sense, nor are they remuneration for plaintiff's work. (*York*, *supra*, 286 F.3d at p. 126.) While not being confined within the jail was the guaranteed, concrete benefit bestowed as a result of successful and compliant participation in the program, what a lack of jail confinement resulted in for different AOWP participants would have been incidental and variable—much like favorable references, networking opportunities, and resume enhancements that often (and hopefully) result from various forms of unpaid work and volunteer commitments, similar to *York*. Not being incarcerated in jail does not necessarily result in participants having a safer environment during their AOWP participation, nor does it necessarily prevent participants from being exposed to serious criminal offenders. That is hopefully the result, but it is not what *will* occur as a result of successful participation in the program; these nonfinancial benefits are incidental to the single, promised benefit of *successful* participation in the program: no incarceration.[10]

It is also not clear *Arriaga* would have deemed the benefits plaintiff claims here sufficient remuneration—working in lieu of incarceration is different in character than working for credit toward a monetary fine. The benefits plaintiff obtained were incidental to not being incarcerated; they were not the guaranteed benefit of successful completion of the AOWP. (Cf. *Juino*, *supra*, 717 F.3d at pp. 439–440 [volunteer firefighter received $2 per fire/emergency call, life insurance, a uniform and badge, and firefighting and emergency response gear deemed benefits merely incidental to volunteer service and not remuneration].)

While plaintiff did not point to his workers' compensation benefits as part of his purported remuneration, we agree with *Estrada* that AOWP participants' workers'

---

**10** According to Crump, the probation officer overseeing the AOWP at the time plaintiff participated, one of the hoped-for benefits of the program is to help participants avoid attendance interruptions at jobs they may hold. Plaintiff did not attest to this form of benefit, but, if he had, it would still have been an incidental benefit of the program.

compensation coverage, by itself, does not constitute significant financial remuneration. (*Estrada*, *supra*, 218 Cal.App.4th at pp. 154–155; compare *Haavistola, supra,* 6 F.3d at pp. 221–222 [issue of fact whether receipt of 11 different types of benefits, including workers' compensation coverage, was sufficient remuneration].)  In *Estrada*, the plaintiff, a volunteer reserve officer, had been included by the city within the definition of "employee" for the purposes of workers' compensation coverage.  (*Estrada*, *supra*, at p. 154 & fn. 9.)  The court reasoned the city's decision to do so was a policy determination that did not "convert these uncompensated volunteers into municipal employees for all purposes."  (*Id.* at p. 155.)  *Estrada* reasoned the workers' compensation benefits, similar to the city's decision to provide recurring $50 reimbursement for out-of-pocket expenses, "serve[d only] to make a volunteer whole in the event the volunteer were to sustain injury while performing his or her duties."  (*Ibid.*)  Despite the value of the workers' compensation benefits, the court held the purpose was not remuneration for work performed, it was to compensate for industrial injury.  (*Ibid.*)

We agree.  Workers' compensation benefits are not remuneration for work performed for the same reason damages or agreed-upon payments for injury or physical sickness are not considered income—they are a restoration of capital, not a remunerative benefit bestowed.  (See *Commissioner v. Glenshaw Glass Co.* (1955) 348 U.S. 426, 432 fn. 8; 26 U.S.C. § 104, subd. (a)(2) [gross income does not include damages for personal physical injuries or sickness].)  The same reasoning applies here:  plaintiff was covered under county's workers' compensation program and was paid for the losses he sustained as a result of injury; this was not remuneration for his work, it was recompense for injury.

Moreover, nothing in the record indicates whether plaintiff was deemed an employee for purposes of workers' compensation because he met no applicable exclusion, like in *Arriaga*, or whether county has made a policy decision to expressly designate AOWP participants "'employee[s]'" for purposes of workers' compensation, as

was the case in *Estrada*, *supra*, 218 Cal.App.4th at page 155.  (Lab. Code, § 3363.5, subd. (a).)**11**

Nevertheless, the fact that plaintiff was covered under workers' compensation is not incongruent with the determination he is not an employee of county for the purposes of the FEHA.  In both *Shephard* and *Mendoza*, the courts determined the student athlete and the volunteer plaintiffs before them, respectively, were not employees within the meaning of the FEHA.  (*Shephard*, *supra*, 102 Cal.App.4th at p. 840; *Mendoza*, *supra*, 128 Cal.App.4th at p. 629.)  The courts emphasized this result under the FEHA was consistent with the fact neither of the plaintiffs would have been an employee within the meaning of the workers' compensation statute.  (*Shephard*, *supra*, at pp. 842–843; *Mendoza*, *supra*, at pp. 634–635.)  *Mendoza* echoed *Shephard*'s reasoning that this consistency underscored the result reached under the FEHA:  the workers' compensation statute and the FEHA are both designed to provide workplace protection for employees and should be construed together in a "'harmonious fashion.'"  (*Mendoza*, *supra*, at p. 635.)

While interpreting the WCA and the FEHA in a harmonious fashion is sound logic, the situation here does not represent the same type of potential incongruity that concerned *Shephard* and *Mendoza*.  The WCA, like the FEHA, was designed to provide workplace protection for employees, but the two statutory schemes are not identical. While coverage under the WCA requires the existence of an employer-employee relationship, the WCA "extends beyond those who have entered into 'traditional contract[s] of hire.'"  (*Arriaga*, *supra*, 9 Cal.4th at p. 1061.)  As reiterated in *Arriaga*, the

---

**11**     *Estrada* distinguished itself from *Shephard* and *Mendoza* in this regard, noting that Estrada's coverage under the WCA was not because he came within the WCA's definition of "employee," but because the city in that case had specifically designated those types of volunteers as "'employee[s]'" for purposes of workers' compensation. (*Estrada*, *supra*, 218 Cal.App.4th at p. 155.)  Crump, the probation officer tasked with overseeing the AOWP at the time of plaintiff's participation, indicated AOWP participants were covered under workers' compensation, but nothing further was stated about *why* that was the case.

WCA accomplishes its goal of comprehensive coverage of workplace injuries by "'defining "employment" broadly in terms of "service to an employer" and by including a general presumption that any person "in service to another" is a covered "employee." [Citations.]'" (*Ibid.*; see Lab. Code, § 3357.)

The term "employee" under the FEHA, on the other hand, is not made expansively inclusive by a similar presumption, and the contours of inclusion and exclusion under the two statutes are different. The courts in *Shephard* and *Mendoza* noted the plaintiffs before them were expressly excluded from the definition of "employee" under the WCA—one as a volunteer receiving no remuneration (*Mendoza*), and one as a student athlete (*Shephard*). Given the arguably broader *inclusion* of workers as employees under the WCA, it would have been inconsistent to find the plaintiffs in those cases were nonetheless employees within the meaning of the FEHA, which does not expansively define employee as does the WCA. To the extent plaintiff comes within the definition of "employee" under the WCA, it is not an incongruence that plaintiff is not an "employee" under the FEHA.

## C.    Dispute Over Plaintiff's Volunteer Status

The parties dispute whether the trial court erred in finding plaintiff was a volunteer participant in the AOWP. At his deposition, plaintiff testified that while he was "not sure" whether he had a choice between incarceration and AOWP participation, he stated "[t]he judge told me to do the [AWOP] so I guess I had a choice." In his declaration in support of his opposition to the motion for summary judgment, plaintiff stated he was "not certain whether [he] had a choice between serving the time in jail or the AOWP, but [he] did not want to go to jail."

The court concluded plaintiff's declaration was "vague and evasive" and failed to raise a triable issue whether plaintiff was given a choice of going to jail or participating in the AWOP. Plaintiff argues this ruling impermissibly weighed the factual evidence and made a credibility determination, which the trial court was precluded from doing. We

review the trial court's determination under the abuse of discretion standard. (*O'Neal*, *supra*, 8 Cal.App.5th at pp. 1198–1199.)

Plaintiff's declaration regarding his subjective belief about whether his participation in the AOWP was forced is not sufficient to raise a triable issue of fact. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 [the plaintiff's "subjective beliefs … do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations[]"].) This is so regardless that declarations opposing summary judgment are to be liberally construed (*Saelzler*, *supra*, 25 Cal.4th at p. 768), because whether plaintiff subjectively did not believe, or was not sure, whether he had a choice to participate in AWOP does not establish his participation in the program was conscribed in view of his deposition testimony that he had a choice (*Ahrens v. Superior Court* (1988) 197 Cal.App.3d 1134, 1152 [equivocal evidence insufficient to show triable question of fact]). Additionally, we note Penal Code section 4024.2 provides for the creation of county work release programs to allow for one day of participation to be in lieu of one day of confinement. By statute, these work release programs are to be voluntary and to consist of manual labor. (*Id.*, subds. (a), (b).)[12]

Yet, even assuming the trial court erred, plaintiff has not established how the ruling was prejudicial. (*Linton v. DeSoto Cab Co., Inc.* (2017) 15 Cal.App.5th 1208, 1224 [the appellant claiming evidentiary error must "affirmatively demonstrate[] prejudice"]; Evid. Code, § 354.) Whatever plaintiff's "volunteer" status, it is not material to whether he may be an employee for the purposes of the FEHA. Application of the threshold-remuneration test does not pivot on whether plaintiff was a volunteer, nor does

---

[12] Because plaintiff was not committed by the court to county jail, but was referred by order to county's AOWP, this does not appear to bear indicia of a work release program under Penal Code section 4024.3, which applies to and involves persons committed to a correctional facility. (See *id.*, subd. (a).) Even so, participation in work release programs under Penal Code section 4024.3 are not necessarily *involuntary*. (*Id.*, subd. (a) ["Priority for participation in the work release program shall be given to inmates who volunteer to participate in the program."].)

plaintiff's status as a volunteer or lack thereof alter whether he may be considered an employee for purposes of the FEHA. (See Cal. Code Regs., tit 2, § 11008, subd. (k) ["Unpaid interns and volunteers may or may not be employees."].) In *Graves*, the plaintiff seeking membership in the WPRA was not a volunteer (*Graves*, *supra*, 907 F.2d at p. 71), nor, necessarily, was the unpaid student intern in *O'Connor* (*O'Connor*, *supra*, 126 F.3d at p. 115), nor were the public assistance beneficiaries in *City of New York* (*City of New York*, *supra*, 359 F.3d at p. 92).

Moreover, while the plaintiffs in *Mendoza* and *Estrada* were referred to as volunteers, that status was not relevant to whether they were precluded from being an employee under the FEHA. For purposes of the threshold remuneration test, the question is whether there has been receipt of significant financial remuneration, either direct or indirect. Even to the degree there was a factual dispute over plaintiff's status as a volunteer, it is not a *material* dispute for purposes of whether plaintiff was precluded from being an employee within the meaning of the FEHA due to a lack of financial remuneration.

## D.     Conclusion

Even considering that the FEHA is a remedial statute, intended for broad interpretation (see *Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1114, citing §§ 12921, 12920, 12993), the threshold requirement of claims such as plaintiff's is the existence of an employment relationship (*Vernon*, *supra*, 116 Cal.App.4th at p. 123). The FEHA cannot be interpreted so broadly as to obviate this primary requirement for the FEHA claims at issue in this case. The touchstone of an employment relationship is remuneration, and there is no indication the Legislature intended for an employment relationship to exist in the absence of sufficient remuneration. (*Mendoza*, *supra*, 128 Cal.App.4th at pp. 636–637.) While remuneration alone is not a sufficient condition to establish an individual is an employee under the statute, it is an essential one. (*Id.* at p. 636; *O'Connor*, *supra*, 126 F.3d at pp. 115–116.)

To be an employee within the meaning of the FEHA, a plaintiff must receive financial remuneration, either direct or indirect. As plaintiff earned no sufficient financial remuneration as a result of participation in the AOWP, he could not be deemed an employee under the FEHA, and the court properly granted county's motion for summary judgment as to plaintiff's claims.

## IV. Remaining Arguments

In the absence of proof of significant, financial remuneration, plaintiff cannot be deemed an employee within the meaning of the FEHA. As such, we do not reach plaintiff's remaining arguments regarding other indicia of his employment status with county, whether county accommodated his disability, or engaged in the interactive process.

Although plaintiff noted the trial court's dismissal of his negligence cause of action, no substantive argument was made thereto. Any assertion of error regarding dismissal of plaintiff's negligence claim is waived. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [failure to present argument, cite legal authority, or provide adequate record citation results in waiver of the issue].)

## DISPOSITION

The judgment is affirmed.  Respondent is awarded the costs of appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

_____
MEEHAN, J.

WE CONCUR:


_____
DETJEN, Acting P.J.


_____
SMITH, J.